UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DICKIE RAY HENRY                          CIVIL ACTION

VERSUS                                    NUMBER: 12-2724

CAROLYN W. COLVIN, ACTING                 SECTION: "C"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 11, 12).

Dickie Ray Henry, plaintiff herein, filed the subject application for DIB on November 3, 2010, with a protective filing date of October 25, 2010, alleging disability as of October 15, 2010. (Tr. pp. 169, 121-127). In a Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were identified as neck and shoulder injuries, nerve damage to the leg, shoulder, and arm, and headaches. (Tr. pp. 144-151).

Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on January 21, 2011. (Tr. pp. 70-73). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on August 17, 2011 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 74-75, 20-60). On August 26, 2011, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 5-19). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-3). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

> I.   THE FINDING THAT PLAINTIFF'S HEADACHES ARE NOT A SEVERE IMPAIRMENT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO RELEVANT LEGAL STANDARDS.
>
> II.  THE ALJ'S MEDICAL OPINION WEIGHT FINDINGS ARE CONTRARY TO LAW AND ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.
>
> III. THE ALJ FAILED TO FULLY DEVELOP THE RECORD BY FAILING TO MAKE RELEVANT EVIDENCE THAT MAY ESTABLISH PLAINTIFF IS DISABLED PART OF THE RECORD.

(Rec. doc. 11-2, p. 11).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.   [t]he claimant has not engaged in substantial gainful activity since October 15, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   [t]he claimant has the following severe impairment:  left brachial neuritis (20 CFR 404.1520(c)).

4.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is restricted from climbing ladders, ropes, and scaffolds and is limited to occasional climbing of ramps and stairs.  He is also limited to less than occasional pushing and pulling and overhead work activity with the left upper extremity.

6.   [t]he claimant is capable of performing [his] past relevant work as an oilfield equipment mechanic supervisor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  (20 CFR 404.1565).

7.   [t]he claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2010, through the date of this decision (20 CFR 404.1520(f)).

(Tr. pp. 10, 11, 15, 16).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's

findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner.  <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act.  <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of

performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that he has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th

Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of the claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." Villa, 895 F.2d at 1022 (citing Jones v. Bowen, 829 F.2d 524, 527 n.2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis.   Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

The medical evidence of record is, relatively speaking, fairly scant.  On January 18, 2010, plaintiff was seen by Dr. Andre Cenac for evaluation and status post conservative management following an earlier injury to his shoulder at work.  Plaintiff was said to be doing well and was given refills for Mobic and Ultracet and was directed to return in three months.  (Tr. p. 225).  Plaintiff returned to Dr. Cenac for further management of his neck and shoulder on April 19, 2010 and was having some headaches at the time.  The plan was to "... work on a little bit of medical regimen" and plaintiff was to return to the clinic in four to six weeks.  (Tr. p. 223).

On May 3, 2010, plaintiff was seen by Dr. Donald Gervais of the Southeast Neuroscience Center in Houma.  Plaintiff was then fifty-five years of age with a history of left brachial neuritis with neck pain on the left greater than the right.  His greatest

limitations were neurologic in that his neurogenic dysfunction was causing him decreased use of his left arm. Plaintiff was still working at that time. Medications included Keppra, Imitrex, Gabapentin, Mobic, Cymbalta, and Pamelor. While the treatment note from that date references an earlier note of January 28, 2010, that earlier note is not part of the record. Upon physical examination, plaintiff had no evidence of trauma to the head and the neck was supple with a free range of motion and no cervical bruits. Examination of the cardiovascular system and the extremities was unremarkable but plaintiff had tenderness in the left levator scapulae and an unspecified amount of atrophy in the left pectoral muscle versus the right.

A neurological examination revealed normal tone throughout and fine motor function was dexterous bilaterally. In terms of muscle mass, fasciculations were noted in the left pectoral muscle which had not been seen previously which was suggestive of ongoing root irritation since plaintiff had undergone left shoulder surgery some years earlier. Strength was intact and gait was normal but plaintiff had persistent sensory changes in the C5-6 dermatomes and reflexes were slightly diminished on the left. Although no new laboratory or imaging studies had been done, reference was made to various test results which pre-dated the relevant time period.[1]/

_____

[1]/ Under 20 C.F.R. §404.1512(d), the Commissioner is required to develop the medical history of a DIB claimant for at least twelve months prior to the month in which the application for

The impression was left brachial neuritis, left arm pain, and left neck pain. Dr. Gervais believed that plaintiff's greatest difficulties were from a neurological perspective with brachial plexus issues limiting the use of his left arm. Flexeril was to be substituted for Amrix, Keppra was to be discontinued, and Zonegran was to be added to plaintiff's total medication regimen which was to continue "... for at least the next five years." Lidoderm patches were also contemplated as a possibility. (Tr. pp. 181-183).

Plaintiff was next seen by Dr. Cenac for orthopedic management on June 2, 2010. His medication was to be "upgraded slightly" and he was to return to the clinic in two to three months. (Tr. p. 222). Plaintiff then returned to Dr. Gervais on July 9, 2010 for some right-sided, but predominately left-sided, symptoms. Plaintiff complained of intermittent left arm weakness, particularly when he was overactive. He was still able to perform the necessary tasks at work but was not able to do his previous job at all. Plaintiff was experiencing two to three headaches per week which were related to some stressors at home and that was said to be his most significant issue at the time. Physical examination revealed tenderness to the left levator scapulae and the left

---

benefits was filed unless there is reason to believe that development of an earlier time period is necessary. As plaintiff protectively filed his application for DIB on October 25, 2010 and alleged an onset date of October 15, 2010, the relevant time period thus begins in September of 2009.

trapezius muscle as well as giveaway weakness on abduction of the left arm. There was also tenderness in the occipital area bilaterally. Neurologically, normal muscle tone was present throughout and fine motor function was dexterous bilaterally. Fasiculations were again noted in the left pectoral muscle as were persistent sensory changes in the C5-6 dermatomes. Strength was intact and gait was normal. The impression was left brachial neuritis, cervicogenic headaches, and left shoulder pain. Although Dr. Gervais' objective neurological findings were the same as plaintiff's previous visit, he remarked that plaintiff's neurologic issues had given him restrictions that were not previously noted. The doctor expressed concern over plaintiff's progressive headache symptomatology. Plaintiff's medications were adjusted and he was to return in two to three months when some recommendations were to be made about his neck issues, possibly including occipital nerve blocks. (Tr. pp. 184-186).

Plaintiff returned to Dr. Cenac on August 2, 2010 who simply refilled his medication and instructed him to return in three months. (Tr. p. 221). He then saw Dr. Gervais on September 9, 2010 and reported that he was still hurting. Plaintiff had recently settled the workers' compensation claim arising out of his earlier workplace injury and had a set-aside fund. As needed, plaintiff took Pamelor, Imitrex, Flexeril, and Mobic intermittently which were helpful in relieving his pain. Once again, plaintiff's

neck was supple with a free range of motion and no cervical bruits. There was tenderness in the left shoulder as was noted at the previous visit and the results of the neurological examination were unchanged.  The impression on this date was left brachial neuritis and left shoulder pain.  The plan was to refill plaintiff's medications after his workers' compensation fund was set up.  (Tr. pp. 187-189).  The administrative record contains a disbursal letter from an attorney who had apparently represented plaintiff in connection with his workplace injury in which the total settlement was recited to be $1,370,000.00 with the net settlement funds being $897,999.54 after deductions for attorney's fees and expenses. (Tr. p. 179).

When plaintiff was next seen by Dr. Gervais on October 1, 2010, he expressed a desire to wean himself off his various medications despite continuing to experience pain.  The results of a physical examination were unchanged.  The impression was again left brachial neuritis and left shoulder pain.  A plan for weaning plaintiff off his medications was arrived at and it was hoped that he would transition to an as-needed follow-up status only.  (Tr. pp. 190-192).

On November 15, 2010, plaintiff completed the Administration's "Function Report-Adult" form that elicited information on how his conditions limited his activities.  There, plaintiff indicated that his ability to work was limited by nerve damage from the neck to

the finger tips on the left side; headaches and muscle cramps in
the left shoulder that were caused by changes in the weather; and,
burning in the left arm.   When asked to describe his daily
activities, plaintiff stated that, with the help of a friend, he
fed his cows, horses, and dog and rode around the house on his
tractor except on the days that he had a headache on which he took
medication and slept.   He could not sleep on his left side.
Plaintiff could engage in personal care activities, prepare meals,
do laundry, sweep, make minor household repairs, and mow the lawn
in one-hour segments over a total of four hours.

Plaintiff was able to drive and shop and interests included
watching TV and going to rodeos and bull riding events, visiting
with family, and attending church.   Plaintiff had less patience
with others and had reduced his physical activities.   Grip
strength, lifting, and reaching with the left arm were effected and
concentration was diminished.   Plaintiff estimated that he could
walk for two miles before needing to briefly rest, concentration
was limited to twenty to thirty minutes, and stress and changes in
routine were problematic.   Medication side-effects rendered him
unable to perform the job he once had and when he began working as
a service coordinator in the shop, the stress caused him to have
headaches three times per week that were relieved only by
medication and sleep.   (Tr. pp. 155-162).

Plaintiff returned to Dr. Gervais on January 3, 2011, stating

that he was doing okay despite his physical problems which included some atrophy of the shoulder girdle muscles. He was taking his medications as needed and exacerbation was brought on when he was active or there were weather changes. Plaintiff had intact strength, normal muscle tone throughout, and fine motor function was dexterous bilaterally but there was some pectoral weakness as well as atrophy on the left greater than the right. The impression was brachial neuritis on the left. Plaintiff's medications were continued on an as-needed basis and a disability evaluation was to occur soon with the doctor remarking that "I do feel [that] he is disabled." (Tr. pp. 209-211).

On January 13, 2011, plaintiff underwent a consultative evaluation by Dr. Jonathan Sanders. Presenting problems were identified as the neck, shoulder, and arm as a result of plaintiff's workplace injury in February of 2007 in which a fifty-three pound pipe fell on him from sixty-five feet above, hitting him in the head and shoulder and fracturing his cervical spine and left shoulder. Treatment for those injuries included shoulder surgery, steroid injections to the cervical spine, and physical therapy. Plaintiff still experienced pain from the neck and shoulder to the left arm with tingling and numbness. He also had daily headaches that were global in nature with photophobia and a history of torticollis. Pain was daily to a level of "6" out of 10, improved with medications and worse with use. Plaintiff was

not working at the time.   He was able to perform household activities, could dress and feed himself, drive, and visit with family and friends.   Plaintiff's self-reported estimated level of functional activity included an ability to lift fifty pounds, to sit for three hours, to stand for two hours, and to walk two miles.

Upon physical examination, there were no signs of atrophy, joint tenderness, swelling, redness, or increased warmth except the left deltoid and trapezius were mildly atrophied as compared with the right.   There was 5/5 muscle strength, normal tone, and normal movements to the lower extremities and the right upper extremity but strength was 4/5 in the left upper extremity.   Sensation was equal bilaterally in all extremities.   There was a normal range of motion in all major joints but radicular pain was produced in the left arm upon range of motion.   Grip strength and dexterity were normal.   The functional assessment was pain on the left with pushing, pulling, and reaching.   In summarizing plaintiff's neck, shoulder, and arm problems, Dr. Sanders opined that, while there was no decreased range of motion, radicular pain was elicited with pushing, pulling, reaching, and passive range of motion of the left arm and that strength in the left upper extremity was slightly diminished to 4/5.   (Tr. pp. 196-199).

On January 20, 2011, Dr. Charles Lee, an Administration doctor with a specialty in orthopedics, reviewed plaintiff's file as it was then extant and opined that plaintiff had the residual

13

functional capacity for light work. (Tr. pp. 66-67, 200). Refills of Mobic, Ultracet, and Fiorinal were authorized by Dr. Cenac on March 3, 2011. (Tr. p. 226). On March 14, 2011, Dr. Gervais completed a two-page checklist form that had been provided to him by plaintiff's attorney in which he indicated that plaintiff could stand, walk, and/or sit for less than one hour in an eight-hour day; could occasionally lift/carry less than ten pounds; could not use his hands for repetitive pushing and pulling; could never bend, kneel, squat, crawl, or climb stairs or ladders; and, had an inability to reach above shoulder level. As a result of his pain, Dr. Gervais further indicated that plaintiff had a marked limitation in his ability to perform activity within a schedule, maintain regular attendance, and be punctual with customary tolerances and had an extreme impairment in the ability to complete a normal work day and week without interruptions from medically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff could also never tolerate stress. (Tr. pp. 205-207).

The final pieces of documentary evidence that were admitted in the administrative proceedings below document plaintiff's return visits to Dr. Gervais and Dr. Cenac on June 22, 2011. In the former's treatment note, the doctor recalled maintaining plaintiff on a combination of Gabapentin, Zonegran, Imitrex, and Flexaril which did help, but activity tended to make him worse. Once again,

plaintiff's neck was said to be supple with a free range of motion and no cervical bruits but there was tenderness in the left shoulder blade area.  Results of the neurological examination were unchanged.  The impression was left brachial neuritis and the plan was to continue plaintiff's medications.  Plaintiff was to be maintained on a workers' compensation fee schedule in light of his settlement.  (Tr. pp. 213-215).  Plaintiff apparently received a left shoulder injection by Dr. Cenac on the same day. (Tr. p. 218).  Refills for Mobic, Ultracet, and Fiorinal were authorized.  (Tr. p. 226).

As noted earlier, a hearing de novo before an ALJ went forward on August 17, 2011.  After the documentary exhibits were admitted into evidence, plaintiff's counsel argued that plaintiff was disabled based upon the findings of Doctor Gervais which the ALJ took issue with as the findings set forth in the doctor's contemporaneous treatment notes were at odds with those that the doctor had recorded in the checklist form on March 14, 2011.  After somewhat of a testy exchange between the two, counsel recalled plaintiff's workplace injury and subsequent surgery in July of 2008, following which he underwent a functional capacity evaluation ("FCE").  That testing revealed plaintiff to be capable of just below the level of heavy work activity.  A copy of the FCE report was then provided to Dr. Gervais who prepared a written response to it on November 24, 2008 in which he questioned the FCE findings.

15

However, that response had not been made part of the record because it was generated well before the alleged onset date. Thereafter, plaintiff began working for his employer again at more of a medium exertional level where he reportedly reaggravated his injury and underwent an EMG which revealed worsening of the plexus. In addition to the November 24, 2008 response, counsel had other records from Dr. Gervais that dated back to plaintiff's injury in 2007. After reviewing the response, the ALJ questioned its significance given its brevity in the context of the litigation that had been spawned by plaintiff's workplace injury. Counsel then argued that plaintiff's headaches had increased in severity in 2010, requiring a great deal of medication that caused functional limitations. Those limitations and the pain that plaintiff was experiencing, so stated counsel, rendered him unable to work. (Tr. pp. 22-29).

Plaintiff then took the stand and was questioned by the ALJ. Through that questioning, it was revealed that plaintiff, who had moved to Kentwood, Louisiana in October of 2010, would have to drive upwards of three hours to see Dr. Gervais in Houma. Despite plaintiff's complaint of debilitating headaches, Dr. Gervais' most recent treatment note of June 22, 2011 made no mention of their occurrence. Although plaintiff also saw Dr. Cenac on that same date, the visit was brief indeed and the cortisone shot that he received had actually been administered by an intern or doctor's

assistant.  Plaintiff then explained that there had been occasions in the past when treatment that he had received had not been properly documented.  He further explained that he had moved to Kentwood to lead a more tranquil life and to attempt to wean himself from the medications.  (Tr. pp. 29-37).

The ALJ then questioned plaintiff about his past work.  As a service specialist for Haliburton, plaintiff would assemble equipment at the shop and deliver it to oil wells on land and offshore.  Plaintiff had also functioned as a service coordinator in different capacities, one as a team coordinator/field service quality coordinator that involved personnel management and training and one as a shop service coordinator overseeing the assembling of equipment and managing upwards of fifty to sixty employees.  When asked why he had stopped working, plaintiff identified headaches and arguments with others at work.  Plaintiff had settled his workers' compensation claim in September of 2010, initially retiring after investing half of the money and buying the house and furnishings in Kentwood.  He owned an ATV-type vehicle which his grandchildren drove him around on.  (Tr. pp. 37-41).

Upon being tendered to his attorney for further questioning, plaintiff testified that in addition to the arguments that he encountered when he returned to work after his settlement, he experienced headaches from the glare of the computer screen.  He was no longer able to engage in the physical labor he once had and

when he was taking a lot of medication, he would take naps in his office for an hour or two.  After his original workplace injury, surgery, and recuperation, plaintiff had initially returned to his job offshore but was told by the company doctor that he could no longer continue due to the combination of the medications he was taking.  Plaintiff experienced "regular" headaches twice per week and migraine headaches once per week with contributing factors being stress or excessive use of his left shoulder which still hurt regularly and was getting worse with tightness and pain to the neck.  At the last office visit that he had with Dr. Gervais, plaintiff had reportedly been told that his condition would worsen to the point where he would need additional surgery and injections to the spine, treatment that was not reflected in the doctor's medical records.  Plaintiff's visits to Dr. Cenac were largely to ensure that he continued to exercise his left arm as his shoulder muscle had been greatly affected in his injury.  (Tr. pp. 41-45).

Continuing, plaintiff testified that he frequently had to change positions while sleeping and that three fingers on his left hand sometimes tingled or became numb.  Pain increased with activity such as lifting or repetitive movements and with weather changes.  Plaintiff testified that he could vacuum, prepare simple meals, and do laundry and hobbies included caring for his dogs, horses, and cows with the assistance of his brother and two friends.  He could no longer hunt or fish as he once had.  The

18

biggest impediment to him working was drowsiness caused by his medications which he himself paid for.  (Tr. pp. 45-48).

In response to the ALJ's additional questions, plaintiff testified that he lived on forty-eight acres of land where he had thirteen cows, six calves, two bulls, two horses, and three dogs, with a great deal of testimony being elicited about the animals' dietary needs.  Plaintiff could mow the lawn for an hour at a time. Having a lawn seven acres in size, plaintiff was helped in that effort by his wife, brother, and a friend.  A great deal of irrelevant testimony was also elicited about who plaintiff's favorite characters were in the television shows that he watched. (Tr. pp. 48-53).

Wendy Klamm, a VE, was the next witness to take the stand. Upon being questioned by the ALJ, Klamm first classified the exertional and skill demands of plaintiff's previous jobs, one being shop supervisor which involved medium, skilled work and the other being an oilfield equipment mechanic supervisor which involved light-level, skilled work.  The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who could occasionally lift and/or carry twenty pounds and who could frequently lift and/or carry ten pounds; who could sit, stand, and/or walk six hours per eight-hour workday; whose ability to push and pull with the left upper extremity was limited to less than

occasional; who could never climb ladders, ropes, or scaffolds and could occasionally climb ramps and stairs; and, whose ability to engage in overhead work activity with the left upper extremity was limited to less than occasionally. With those limitations in mind, the VE testified that the individual described in the hypothetical question could not perform plaintiff's past work as a shop supervisor but could perform that as an oilfield equipment mechanic supervisor. (Tr. pp. 53-56).

After being tendered to plaintiff's attorney for further questioning, the VE was asked to assume the same limitations set forth in ALJ's hypo but the individual was further limited to simple, repetitive tasks with no detailed instructions due to medication side-effects and pain. With those added limitations in mind, the VE testified that the described individual could not perform plaintiff's past work. The VE further testified that if the hypothetical individual could not lift ten pounds because of neck problems, he could not perform plaintiff's past work as a shop supervisor. And if the individual, as a result of pain, had frequent limitations in his ability to perform work within a schedule, to have regular attendance and punctuality, and to complete a normal workday and week without interruptions from symptoms, there would be no work that the individual could perform. (Tr. pp. 56-57).

In response to the ALJ's further questions, plaintiff

20

testified that Drs. Gervais and Cenac were both aware of what the other was prescribing and that he also obtained advice from his pharmacist as to any possible drug interactions.   Each of the doctors had prescribed medication that was specific for certain headaches and had cautioned plaintiff on over-medicating. Plaintiff was content to continue treating with the doctors that he had so as to avoid having to develop a new doctor-patient relationship.  (Tr. pp. 57-60).

Plaintiff challenges the Commissioner's decision to deny him DIB on three grounds.  In the first of those, plaintiff argues that the ALJ erred in failing to find that his headaches were a severe impairment.

The administrative record contains contemporaneous treatment records documenting that plaintiff was seen by Dr. Cenac on six occasions and that he was seen by Dr. Gervais on six occasions. With respect to Dr. Cenac, his treatment notes are extremely brief, contain no objective findings, and on only one occasion, April 19, 2010, were headaches even mentioned at all.  To the extent that plaintiff was experiencing "some headaches" at that time, he was, in fact, able to work subsequent to that date in spite of that condition.  Vaughn v. Shalala, 58 F.3d 129, 131 (5th Cir. 1989). Of the six documented occasions when plaintiff was seen by Dr. Gervais, on only one of those occasions, July 9, 2010, were plaintiff's headaches of such significance that they were included

in the doctor's diagnostic impressions.  At that time, plaintiff was said to be experiencing headaches at a rate of two to three per week due to stressors at home.  Nevertheless, he advised Dr. Gervais that he was still able to function at work.  Vaughan, 58 F.3d at 131; Johnson, 864 F.2d at 347-48.  By the time of plaintiff's next visit with Dr. Gervais on September 9, 2010, approximately one month prior to the alleged onset date, plaintiff's headaches were no longer of such significance that they warranted inclusion in the doctor's diagnostic impressions.  Even then, plaintiff was only taking medication on an "as needed" basis and in none of the doctor's contemporaneous treatment notes did he impose any headache-related limitations, another proper consideration.  Leggett v. Chater, 67 F.3d 558, 565 (5ᵗʰ Cir. 1995); Vaughan, 58 F.3d at 131.

By October 1, 2010, which is again before the alleged onset date, plaintiff expressed a desire to be weaned from his medications which points to the inference that his conditions, including his headaches, were not sufficiently significant to require prescription medication.  The diagnosis was left brachial neuritis and left shoulder pain.  On January 3, 2011, plaintiff was said to be doing okay, taking medication on an "as needed" basis.  Headaches were not mentioned in Dr. Gervais' treatment note and the diagnostic impression was only brachial neuritis.  Contrary to these minimal findings by his treating physician, plaintiff advised

Dr. Sanders on January 13, 2011 that he experienced daily global headaches with photophobia.  No functional limitations as a result of plaintiff's headaches were imposed.  Plaintiff would be seen one final time by Drs. Gervais and Cenac on June 22, 2011 and nowhere were headaches mentioned in their treatment notes much less were there any limitations related thereto imposed.  Although plaintiff testified to experiencing two regular headaches and one migraine headache per week, the activities that he testified to being capable of are not indicative of someone who is precluded from performing all work activities.  Anderson v. Sullivan, 887 F.2d 630, 632 (5th Cir. 1989); Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987).

In light of the body of evidence that was before him, the ALJ did not err in failing to find that plaintiff's headaches were a severe impairment, one that significantly limited his ability to engage in work-related activities.  20 C.F.R. §404.1521.  More importantly, inasmuch as consideration of plaintiff's application for DIB proceeded past step two of the §404.1520 sequential analysis and was not summarily denied at that step based on the fact that he did not suffer from a severe impairment, this challenge provides no basis for disturbing the Commissioner's decision.  Adams v. Bowen, 833 F.2d 509, 512 (5th Cir. 1987); Chaparro, 815 F.2d at 1011; Wagner v. Astrue, No. 08-CV-0519, 2010 WL 546739 at *7 (E.D. La. Feb. 12, 2010).

In his second challenge to the Commissioner's decision, plaintiff argues that the ALJ's medical opinion weight findings are contrary to law and unsupported by substantial evidence.  More particularly, plaintiff complains that the ALJ gave "little weight" to Dr. Gervais' opinions while according "significant weight" to those of the non-examining State agency consultant, Dr. Sanders. (Rec. doc. 11-2, p. 15).

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000) (quoting Paul v. Shalala, 29 F.3d 208, 211 (5th Cir. 1994), overruled in part on other grounds by Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080 (2000)).  A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown.  Newton, 209 F.3d at 456 (citing Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999) and Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984 (1995)).  Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion.  Newton, 209 F.3d at 456; Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995); Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir. 1987); Scott v. Heckler, 770

24

F.2d 482, 485 (5th Cir. 1985).  The Regulations require an ALJ to perform a detailed analysis of a treating physician's views under the criteria set forth in 20 C.F.R. §404.1527(c)(formerly §404.1527(d)) only in the absence of controverting medical evidence from other treating and/or examining physicians.  Newton, 209 F.3d at 453.

Plaintiff alleges that the ALJ erred in giving little weight to the opinions of one of his treating physicians, Dr. Gervais, while according significant weight to those of a non-examining State agency medical consultant, Dr. Sanders, as set forth on page eight of the ALJ's written decision of August 26, 2011.  The portion of the written decision complained of by plaintiff is as follows:

> [a]s for the opinion evidence, the State agency medical consultant's physical assessment (Ex. 2A) is accorded significant weight because it is supported by Dr. Sanders' January 13, 2011 consultative evaluation (Ex. 3F) and is consistent with the record as a whole.  Dr. Sanders noted only mild atrophy of the left deltoid and trapezius muscles and 4/5 muscle strength in the left upper extremity.  (Ex. 3F).  Little weight is accorded to Dr. Gervais' opinion that the claimant is "disabled" (Ex. 7F/4) or to the check-box medical source statement completed by Dr. Gervais on March 14, 2011.  (Ex. 6F).  Whether an individual is "disabled" under the Act is an issue reserved to the Commissioner under Social Security Ruling 96-5p.  Further, the medical source statement completed by Dr. Gervais is unsupported by his treatment notes, showing only mild atrophy, and Dr. Sanders' consultative evaluation, also showing only mild atrophy and 4/5 strength of the upper left extremity.  Dr. Gervais' medical source statement is also inconsistent with the claimant's own statements regarding his limitations.  Dr. Gervais stated the claimant could stand less than 1 hour in an 8-hour workday, walk less than 1 hour in an 8-hour workday, sit less than 1 hour in an 8-hour workday, and occasionally lift and carry less than 10 pounds.  (Ex. 6F/2).

> However, the claimant told Dr. Sanders at the consultative
> evaluation that he could stand 2 hours, walk 2 miles, sit 3
> hours, and lift 50 pounds.  (Ex. 3F/1).  Also, Dr. Gervais
> restricted the claimant from bending, kneeling, squatting, and
> crawling (Ex. 6F/3), but Dr. Sanders reported the claimant
> could crouch, squat, and stoop without difficulty.  (Ex.3
> F/3).

(Tr. p. 15).

As a cursory review of the above excerpt demonstrates, Dr. Sanders was not a non-examining State agency consultant but was instead the practitioner chosen by the Commissioner who consultatively evaluated plaintiff on January 13, 2011.  At that evaluation, plaintiff reported that he could perform household activities, dress and feed himself, drive, visit with family and friends, and enjoy his livestock in his free time.  He also estimated that he could lift fifty pounds, sit for three hours, stand for two hours, and walk two miles.  Plaintiff's ability to engage in such activities runs counter to his claim of disability. Leggett, 67 F.3d at 565 n.12; Anderson, 887 F.2d at 632; Chaparro, 815 F.2d at 1010.  The only adverse objective findings noted by Dr. Sanders were mild atrophy to the left deltoid and trapezius and 4/5 muscle strength in the left upper extremity.  The absence of any significant findings may properly be considered by an ALJ in adjudicating a claimant's disability status.  Adams, 833 F.2d at 512.  Largely relying on Dr. Sanders' findings, Dr. Lee, the State agency medical consultant, assessed plaintiff more conservatively as being able to perform light-level work.  The activities that

26

plaintiff admitted that he could perform on the Function Report may also properly be considered by the ALJ.  Vaughan, 58 F.3d at 131.

From a review of the above-quoted excerpt it is also apparent which of Dr. Gervais' "opinions" the ALJ took greatest exception with.  Although the doctor concluded his January 3, 2011 treatment note with a statement that plaintiff was disabled, plaintiff was otherwise described as doing okay and was taking medications on only an "as needed" basis.  While there was some pectoral weakness and atrophy in the left upper extremity as compared with the right, muscle tone was normal throughout and strength was intact.  The impression was brachial neuritis and plaintiff was simply continued on his medications on an "as needed" basis.  In any event, whether plaintiff was disabled within the meaning of the Social Security Regulations is an ultimate issue that is reserved to the ALJ and the Commissioner.  20 C.F.R. §404.1527(d)(1).

The second set of Dr. Gervais' "opinions" that the ALJ took issue with were those set forth on "Physical Capacity Evaluation (PCE)" checklist form that the doctor completed on March 14, 2011. Despite not having seen plaintiff since January 3, 2011 when the largely marginal findings above were recorded, Dr. Gervais checked off blanks on the form indicating that plaintiff could stand, walk, and/or sit for less than one hour and lift less than ten pounds on even an occasional basis.  Those significant findings are roundly at odds with what plaintiff himself recorded in the Function

Report, reported to Dr. Sanders, and testified to at the administrative hearing which included driving for upwards of three hours just to get to Dr. Gervais' office.   The form is also unaccompanied by any contemporaneously-recorded, medical acceptable findings and is thus entitled to little weight on that basis alone. Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980).   The use of such checklist forms is generally viewed with disfavor among the federal courts of appeals and the district courts within the Fifth Circuit when the forms are not adequately supported by any narrative citations to clinical findings.   Haynes v. Astrue, No. 11-CV-2289, 2012 WL 3860467 at *15-16 (E.D. La. July 23, 2012), adopted, 2012 WL 3863171 (E.D. La. Sept. 5, 2012), aff'd, ___ Fed.Appx. ___, 2013 WL 1789447 (5th Cir. 2013)(and cases cited therein); Morris v. Astrue, No. 08-CV-4105, 2010 WL 497748 at *10 (E.D. La. Feb. 1, 2010).   In light of the foregoing, the Court believes that the ALJ's assessment of the opinion evidence before him was a correct one.

In his third and final challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to fully develop the record by failing to make certain evidence a part of the record below.

As was noted earlier in the Court's summary of the administrative hearing that went forward on August 17, 2011, at the outset of that proceeding, plaintiff's counsel endeavored to

provide the ALJ with some history surrounding plaintiff's workplace injury and subsequent treatment, during which the following exchange between the two occurred:

ATTY: * * * * *

> As you know from the record he was hurt and he went to the doctor. He had surgery in July of '08. After the surgery, he apparently underwent an FCE. The FCE was basically for slightly below heavy work activity. That was from 2008. Dr. Gervais reviewed the FCE and said, "that while from an orthopedic standpoint they might be correct, the neurologic findings of Mr. Henry were so severe that would not be recommended." And this was actually a problem.

ALJ:     What are you looking at to tell me that?

ATTY:    I'll give it to you in a second.

ALJ:     Was it something that's not in the record?

ATTY:    Well, yes, because it was way before the onset.

ALJ:     And whatever these severe neurologic findings are or that Dr. Gervais cited from whenever it is that I don't have are present in these later reports, as well?

ATTY:    Yes.   What happened is despite Dr. Gervais['] reservation Mr. Henry actually returned to work for Haliburton and (sic) somewhat medium level – –

ALJ:     Somewhat what?

ATTY:    Medium level.

ALJ:     Oh.

ATTY:    – – and basically what happened and he basically reaggravated his injury and that's when he had the EMG that found worsening of the plexus.

ALJ:     How many records do you have that aren't in this file?

ATTY:    It's not that much.

ALJ:      So, it's a lot?

ATTY:     It's dated from '07 when the injury occurred.  It's just maybe twenty pages.

ALJ:      Oh.  Look at Dr. Gervais' records.

ATTY:     Can I show you the folder that I'm talking about?

ALJ:      Sure.  It looks like Dr. Gervais had disciplinary action against him but (sic) the State Board of Medical Examiners.

ATTY:     Really.  I checked the other day.  I checked yesterday and I didn't find anything.

ALJ:      Oh, I'm sorry, I'm misreading, it says no.

ATTY:     Yes.

ALJ:      They have it presented in a different fashion.

ATTY:     Yes, because I checked and they didn't have any.

ALJ:      What am I looking at?

ATTY:     That's one of his progress notes, apparently. That's what I was telling you about that Mr. Henry underwent an FCE.  It's slightly below heavy work.  Dr. Gervais was quite upset with the finding and noted that in his opinion he should not do that because he was at risk to re-aggravate his injury.  Which I believe that I can show, based on the EMG, that's what happened.

ALJ:      Well, a simple single sheet in the context of what must have been significant litigation and significant paper generation is exactly what it is.  So, I'm going to go based on the records.  I'll make it easy for you.  Is it your claim that the nature of the brachial plexus injury but (sic) it's very nature precludes certain sorts of exertion?

ATTY:     Yes, Your Honor.

ALJ:      I wish you had said that from the get go.  It would have been a lot easier.

(Tr. pp. 26-29).

The   document   that   was   produced   by   counsel   at   the

administrative hearing is a one-page response that Dr. Gervais prepared on November 28, 2008 after reviewing an earlier FCE report. (Rec. doc. 11-4). Based upon a review of the above-quoted exchange, it appears that said document is but one page in a set of approximately twenty pages which counsel had in her possession before the hearing but which she chose not to submit for inclusion in the administrative record beforehand because it was generated almost two years prior to the alleged onset date of October 15, 2010. Notably, during the course of the hearing, counsel did not formally move to have the document in question or any of the other ones in her possession admitted into evidence nor was there any proffer to do so. The document was also not made a part of plaintiff's request for review of the ALJ's decision by the AC. (Tr. p. 4).

That counsel withheld the document and did not deem it sufficiently important to submit it in the record of the administrative proceedings below does not transform that conscious choice into error on the part of the ALJ. As was discussed earlier, it is the claimant who bears the burden of proving his disability through the first four steps of the §404.1520 analysis. Bowen, 482 U.S. 146 n.5, 107 S.Ct. 2294 n.5. To that end, the Regulations require a claimant to provide the medical and other evidence that establishes his disability; if he fails to do so, a decision is made based upon the evidence that is available. 20

C.F.R. §§404.1512(a), (c) and 404.1516.  It must also be remembered
that plaintiff was able to work for almost two years subsequent to
the FCE and that he testified at the administrative hearing that he
stopped working due to headaches and arguments with others, not as
a result of any brachial plexus problems.  In light of that and the
fact that the document in question was generated almost two years
prior to the alleged onset date, plaintiff was not prejudiced by
its absence from the record because the result of the
administrative proceedings would have been no different.  See
Ripley v. Chater, 67 F.3d 552, 557 n.22 (5th Cir. 1995).

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's
motion for summary judgment be denied and that defendant's motion
for summary judgment be granted.

A party's failure to file written objections to the proposed
findings, conclusions, and recommendation contained in a magistrate
judge's report and recommendation within fourteen days after being
served with a copy shall bar that party, except upon grounds of
plain error, from attacking on appeal the unobjected-to proposed
factual findings and legal conclusions accepted by the district
court, provided that the party has been served with notice that
such consequences will result from a failure to object.  Douglass
v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en
banc).

New Orleans, Louisiana, this 28th day of _____ October _____, 2013 .

UNITED STATES MAGISTRATE JUDGE